UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLT Logistics, et al,

      Plaintiff,

vs                                                                    Case No: 10-13282
                                                                      Honorable Victoria A. Roberts
River West Brands, et al,

      Defendants.
_____/

## ORDER

This is a trademark infringement action.  Plaintiffs 1177216 Ontario Ltd. ("1177216 Ontario") and CLT Logistics, Inc. ("CLT Logistics"), filed suit against Defendants Almar Sales Company, Inc. ("Almar"), River West Brands, LLC ("River West"), and Selective Beauty Brands, LLC ("SBB"),  asserting that Defendants violated the Lanham Act and state law through unauthorized use of Plaintiffs' SALON SELECTIVES trademarks.

Before the Court are three motions: (1) Defendants' Motion to Stay, which asserts that abstention is proper in light of a parallel state-court proceeding; (2) Plaintiffs' Motion for Preliminary Injunction, which asserts that Plaintiffs are likely to succeed on their claims of trademark infringement and dilution, and that Defendants' continued use of their marks are causing Plaintiffs irreparable harm; and (3) Defendants' Motion to Dismiss or for Summary Judgment, which asserts that dismissal is warranted because Defendants are licensed to use the marks.

For the following reasons, the Court **DENIES** Defendants' Motion to Stay (Dkt. 16), **DENIES WITHOUT PREJUDICE** Plaintiffs' Motion for Preliminary Injunction (Dkt. 2), **DENIES** Defendants' Motion to Dismiss (Dkt. 10), and **DENIES WITHOUT PREJUDICE**

Defendants' Motion for Summary Judgment (Dkt. 10).

## I. BACKGROUND

Plaintiff 1177216 Ontario Ltd. asserts that it is the sole owner of the SALON SELECTIVES portfolio of marks, including United States Patent and Trademark Office Registration Nos. 1,479,236, for hair shampoo and conditioners; 1,479,244, for hair spray, mousse, and coloring preparation; and 1,523,079, for hair sculpting gel. (Dkt. 17, Pls.' Resp. to Defs.' Mot. Dismiss at 1; Dkt. 1, Compl. ¶ 21, Ex. A.) Plaintiff CLT Logistics claims an interest in these marks through an exclusive license from 1177216 Ontario. (Pls.' Resp. to Defs.' Mot. Dismiss at 1.) Although Plaintiffs frame the dispute as a straightforward trademark infringement action, the points of contention at this stage of the litigation have little to do with whether consumers will be confused by Plaintiffs' use of the SALON SELECTIVES marks. In fact, none of Defendants' briefs argues that their use of the SALON SELECTIVES marks is not likely to cause consumer confusion. Rather, Defendants assert that they have an oral license to use the SALON SELECTIVES marks from one of Plaintiffs' predecessors-in-interest, and in the alternative, have a 50% ownership interest in those marks.

Prior to the events giving rise to this instant dispute, Unilever Supply Chain, Inc. ("Unilever") owned the SALON SELECTIVES marks. (Pls.' Resp. to Defs.' Mot. Dismiss, Ex. A.) Defendants say that in December 2006, Unilever granted Defendant River West an exclusive license to use those marks in exchange for "certain guaranteed annual minimum royalties." (Dkt. 11, Defs.' Resp. to Pls.' Mot. Prelim. Inj., Ex. A, Ashkenazie Decl. ¶ 10.) River West then teamed with Defendant Almar to relaunch the SALON SELECTIVES line of products. To this end, the two companies created Defendant SBB in 2007. Each owned a 50% share of SBB. (Ashkenazie Decl.

¶ 11.)

Defendants claim that late in 2007, Eugene Zeffren, SBB's CEO, granted an oral license to Almar to use the SALON SELECTIVES marks.  (Ashkenazie Decl. ¶ 20.)  Although shifting, it appears that Defendants' position is that SBB sub-licensed the marks to Almar using the rights Unilever granted River West.  (*See* Defs.' Mot. Dismiss Reply at 1 n.1.)  Almar asserts that its license from SBB was fully paid-up and was for a term of five years that could be renewed at Almar's option for addition term of five years.  (Ashkenazie Decl. ¶ 22; Defs.' Resp. to Pls.' Mot. Prelim. Inj., Ex. B, Zeffren Decl. ¶¶ 4-5.)  Although Zeffren allegedly reported his grant of the license to SBB's board of directors, the Board took no formal action to approve the alleged license to Almar.  (Zeffren Decl. ¶ 7; Defs.' Resp. to Pls.' Mot. Prelim. Inj., Ex. C, Thumann Decl. ¶¶ 3, 5.)  A declaration submitted by Mark Thumann, then a member of SBB's board, states, "It was not my understanding that any further action was required by the board of directors in connection with the license, and in any event, I did not have any objection to the grant of the license under terms that Dr. Zeffren believed advisable."  (Thumann Decl. ¶ 5.)  The license is not reflected in any written document.  (Zeffren Decl. ¶ 6.)

In February 2008, SBB (through River West) paid off the remaining royalties due to Unilever under the 2006 exclusive license, and obtained an "outright assignment" of the SALON SELECTIVES marks.  (Ashkenazie Decl. ¶¶ 15-16; Pls.' Resp. to Defs.' Mot. Stay at 2, Ex. A.)  Around that same time, however, it appears that SBB was having financial difficulties.  (Defs.' Mot. Stay at 2-3.)  On February 19, 2008, SBB entered into a credit agreement with non-party Hilco Financial, LLC, which granted Hilco a security interest in the SALON SELECTIVES marks.  (Pls.' Resp. to Defs.' Mot. Dismiss at 2, Ex. A.)  In October 2008, SBB's trustee sold the SALON

SELECTIVES marks to Hilco.  (Defs.' Mot. Stay at 2-3; Pls.' Resp. to Defs.' Mot. Dismiss, Ex. A.)
It appears that a subsidiary of Hilco, HVB, actually acquired the marks. (Ashkenazie Decl. ¶¶ 27,
29.)  This distinction is immaterial.

Following the sale to Hilco, Almar and River West sought to repurchase the assets of
SBB—including the SALON SELECTIVES portfolio of marks.  (Defs.' Mot. Stay at 2-3.)  The two
Defendants enlisted the assistance of two other companies—non-parties Beautology Brands and A.P.
Deauville—with the hope that the four companies would have "sufficient capital and market
expertise to complete the purchase of [the] SBB assets and to continue the re-launch of the SALON
SELECTIVES brand."  (*Id.* at 3; Ashkenazie Decl. ¶¶ 30-32.)

According to Defendants, the four companies agreed that the assets would be purchased from
Hilco in the name of Beautology Brands, and Beautology Brands would then place the assets into
a new holding company, Salon Selectives, LLC.  (Defs.' Mot. Stay at 3-4.)  Defendants say that
under this alleged agreement; each of the four companies would own 25% of Salon Selectives, LLC,
in exchange for Almar and A.P. Deauville each contributing $75,000 toward the buy-back.  (Defs.'
Mot. Stay, Ex. 2, Prager Decl., Ex. A ¶¶ 9, 15.)  Like the alleged SBB-Almar license, however, this
agreement was not in writing.  (*See* Defs.' Mot. Stay at 4; Prager Decl. ¶¶ 8, 13.)  Instead,
Defendants claim they reached an oral agreement, reflected in part by several emails.  (Defs.' Mot.
Stay at 4; Prager Decl. ¶¶ 8, 11, 13, Ex. B1.)

On February 27, 2009, Beautology Brands purchased the assets from Hilco and placed them
into Salon Selectives, LLC.  (*See* Defs.' Mot. Stay at 4; Pls.' Resp. to Defs.' Mot. Stay at 2.)
However, Beautology Brands failed to distribute the respective 25% ownership interest to the other
three companies.  (Defs.' Mot. Stay at 4.)

4

Accordingly, on March 3, 2010, Almar, River West, and A.P. Deauville filed suit in Illinois state court, *River West Brands, LLC et al. v. Beautology Brands Co.*, *et al.*, No. 2010 MR 279 (Illinois 18th Judicial Circuit 2010), seeking a declaration that they each own a 25% share of Salon Selectives, LLC. (Defs.' Mot. Stay, Ex. A, Illinois Compl. ¶ A.) The original state court complaint named Beautology Brands and Salon Selectives, LLC as defendants, and demanded that those two companies "cease and desist from exercising any control or asserting any right, title or interest over the Salon Selectives brand and inventory identified in [this] complaint . . . pending the findings" of the Illinois state court. (Illinois Compl. ¶ B.)

About two-and-half months later, in a letter dated May 21, 2010, Salon Selectives, LLC, believing that it owned the SALON SELECTIVES marks outright, demanded that Almar cease and desist using the SALON SELECTIVES marks. (Compl., Ex. C.) More specifically, the letter says that Salon Selectives, LLC "is the owner of United States trademark registration for SALON SELECTIVES in association with a variety of hair care products," and that Almar "is, entirely without authorization, distributing and selling a variety of hair brushes and hair combs bearing a SALON SELECTIVES designation." (*Id.*)

In an agreement signed on June 28, 2010 (almost four months after the initiation of the Illinois action) Salon Selectives, LLC assigned the marks-at-issue to an Ontario corporation: Plaintiff 1177216 Ontario. (Prager Decl. ¶ 3, Ex. B.) Plaintiff CLT Logistics, also an Ontario corporation, has an exclusive license from 1177216 Ontario to use the SALON SELECTIVES marks. (Pls.' Resp. to Defs.' Mot. Dismiss at 1.)

On August 19, 2010, Plaintiffs filed this action, alleging that Defendants Almar, River West, and SBB, are infringing the SALON SELECTIVES marks that Plaintiff acquired from   Salon

5

Selectives, LLC in June. 2010.

On August 20, 2010, Almar and the other plaintiffs in the Illinois action, requested leave from the state court to amend their complaint to add as additional defendants, the two Plaintiffs who filed this suit.  The state court granted leave to amend; Plaintiffs filed an amended state court complaint, naming both 1177216 Ontario and CLT Logistics as defendants, on September 16, 2010.

## II.  THE COURT DENIES DEFENDANTS' MOTION TO STAY

Defendants move, pursuant to the abstention doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), to stay this case pending resolution of the Illinois action.  In particular, Defendants say that because of the substantial overlap between this case and the Illinois case, abstention promotes judicial economy and avoids piecemeal litigation. (*See* Defs.' Mot. Stay at 6-7.)  Plaintiffs disagree; they assert that the issues in this case are limited to trademark infringement, but the Illinois case "will focus upon contract issues and the dealings of certain parties in relation to the sale of IP assets on February 27, 2009."  (Pls.' Resp. to Defs.' Mot. Stay at 8.)

When a court has subject matter jurisdiction, abstention "is the exception, not the rule." *Colorado River Water*, 424 U.S. at 817.  This is because federal courts have "a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15 (1983) (quoting *Colorado River Water*, 424 U.S. at 817).  With this in mind, a federal court may nonetheless defer to a parallel state-court proceeding in rare situations where abstaining would strongly promote judicial economy and a "comprehensive disposition" of the litigation.  *Colorado River Water*, 424 U.S. at 817-18; *see also Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998).

The Court applies a two-step process to determine whether abstention is appropriate. First, it must decide whether or not the two proceedings are "parallel." *See Romine*, 160 F.3d at 340. If so, the analysis proceeds to a multi-factor balancing test laid out in *Colorado River Water* and subsequent Supreme Court decisions. *See PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001).

### A.  This Case is "Parallel" to the Illinois Case

Although Defendants fail to address the issue, and Plaintiffs provide only a cursory analysis, this Court has a duty to determine whether this case and the Illinois case are "parallel." *Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 571 (6th Cir. 1994) ("A necessary requirement for application of this *Colorado River* doctrine . . . is the presence of a parallel, state proceeding."). Although the Supreme Court has not clearly defined the contours of this requirement, it has noted that parallelism presumes that "the . . . state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties," and that "to invoke *Colorado River* necessarily contemplates that [an abstaining] federal court will have nothing further to do in resolving any substantive part of the case." *Moses H. Cone*, 460 U.S. at 28. The Sixth Circuit says the requirement is satisfied where the two cases, while less than identical, are "substantially similar." *Romine*, 160 F.3d at 340 (finding state and federal actions parallel where they were "predicated on the same allegations as to the same material facts").

Identity of parties in the federal and state actions is not necessary for parallelism, *Bates v. Van Buren Twp.*, 122 F. App'x 803, 806 (6th Cir. 2004), but similarity between the two sets of parties is a relevant inquiry. *See Baskin*, 15 F.3d at 572 (finding no parallelism in part because the parties in the state and federal case differed); *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28,

7

31 (6th Cir. 1984) (same); *see also Bates v. Van Buren Twp.*, 122 F. App'x 803, 806 (6th Cir. 2004) ("The state court proceedings need not be identical, merely 'substantially similar.' There is also no requirement that the parties in the state court proceedings be identical to those in the federal case." (internal citation omitted)).

The similarity of parties in both cases favors a finding of parallelism.  With the amended state court complaint filed, the Plaintiffs in this case (1177216 Ontario and CLT Logistics) are defendants in the state-court action.  Almar and River West, Defendants here, are plaintiffs in the state-court case.   The fact that Defendant SBB is not also a plaintiff in the state action is irrelevant—River West and Almar, which are plaintiffs in the state case, each owned a 50% share in SBB and thus represent its interest.  *Cf. Nakash v. Marciano*, 882 F.2d 1411, 1416-17 (9th Cir. 1989) (finding argument that parties were not identical "disingenuous," explaining that the parties in the federal suit "are all named in the [state-court] suit; the only difference is the absence of all of the corporate entities owned and operated by the parties.").  Nor does the absence of A.P. Deauville in this case suggest that the proceedings are non-parallel.  This merely indicates that—in terms of parties—the state-court action is *more* comprehensive than this case; as such, A.P. Deauville's absence makes it no less likely that the state action will be an "adequate vehicle" to resolve the issues before this Court.  *Cf. Bates*, 122 F. App'x at 806 ("The fact that the state action is broader than the federal is no bar to *Colorado River* abstention, because this fact can only make it more likely that it will not be necessary for the federal courts to determine the federal question.").

A more difficult inquiry is whether there is substantial similarity of issues.  This case does not fall within the more common situations where either the state case mirrors the claims of the federal case, or the state case is more comprehensive than its federal counterpart.  The parties have

not cited, and the Court did not find, any cases from this Circuit which address the issue presented here: whether a federal and state case are parallel where the federal case includes additional claims not asserted in the state case, but the two actions share a common, threshold issue that could dispose of all claims in both cases.  *See Bates v. Van Buren Twp.*, 122 F. App'x 803, 806-07 (6th Cir. 2004) (finding state and federal case parallel where state case encompassed all issues in federal case); *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001) (not explicitly discussing the parallelism requirement); *Romine v. Compuserve Corp.*, 160 F.3d 337, 340-41 (6th Cir. 1998) (finding parallelism where "the state action is actually more comprehensive than the consolidated federal cases."); *Baskin v. Bath Twp. Bd. of Zoning Appeals*, 15 F.3d 569, 571 (6th Cir. 1994) (finding no parallelism where "[t]he two actions arise out of the same basic facts, but they each contest a different aspect of the variance granted by the Township zoning board and they seek different relief."); *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 31 (6th Cir. 1984) (finding no parallelism where parties were different and the federal case raised additional claims, including claims for conduct occurring after the date for which the state court case was concerned).

Viewed differently, this case and the Illinois case are undeniably parallel to a critical point—one which possibly disposes of the entire litigation—but after this point it may be necessary for this case to continue on its own track.  Although case law on this issue is sparse, it does support that the purpose underlying *Colorado River Water* abstention justifies a finding that parallelism exists in this case.

Unlike other forms of abstention which are based on notions of federalism, comity, or the avoidance of unnecessary Constitutional interpretation, the primary, if not sole, justifications for *Colorado River Water* abstention are judicial economy and avoidance of piecemeal litigation:

> Although [a] case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

*Colorado River Water*, 424 U.S. at 817.

When there is a common threshold issue before both the federal and state court, such as the ownership of the trademarks at issue here, the aims of judicial economy and comprehensive disposition are forwarded if there is a substantial possibility that resolving the common issue will dispose of all claims. *See Day v. Union Mines Inc.*, 862 F.2d 652, 656 (7th Cir. 1988) (noting that the parallelism inquiry "look[s] not for formal symmetry between the two actions, but for a *substantial likelihood* that the state litigation will dispose of all claims presented in the federal case." (emphasis added, internal quotation marks omitted)); *One Up, Inc. v. Webcraft Technologies, Inc.*, No. 87 C 3041, 1989 WL 118725, at *3 (N.D. Ill. Sept. 22, 1989) (finding that parallelism requirement was satisfied where state court would adjudicate the threshold issue of patent ownership and, therefore, patent infringement claims before the federal court could become moot); *cf. Romine*, 160 F.3d at 340 (requiring substantial similarity but not identity of issues for parallelism to exist). This is not to say that this type of overlap between a federal and state case necessarily warrants abstention, but merely that there is sufficient parallelism for a court to reach the next step in the analysis, which involves, among other things, a further inquiry into whether abstention will avoid piecemeal litigation. This conclusion applies with particular force in this case: while Lanham Act claims are before this Court, the parties' dispute does not truly center around the likelihood of confusion analysis. Rather, the only asserted defenses to infringement in this case are license and

10

ownership—the latter issue being squarely before the state court.

Accordingly, the Court finds that the federal and state cases are parallel, and that the *Colorado River Water* abstention factors should be evaluated.

## B.  The Balance of the *Colorado River Water* Factors Does Not Justify Abstention

In *Colorado River Water* and subsequent decisions, the Supreme Court identified eight factors "that a district court must consider when deciding whether to abstain from exercising its jurisdiction due to the concurrent jurisdiction of a state court."  *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206 (6th Cir. 2001) (citing *Romine v. Compuserve Corp.*, 160 F.3d 337, 340-41 (6th Cir. 1998)).  These are:

> "(1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; . . . (4) the order in which jurisdiction was obtained[;] . . . (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction."

*Id.* (quoting *Romine*, 160 F.3d at 340-41).  A court is not to treat the factors as a checklist; rather, certain factors should be accorded more or less weight depending on the nuances of a particular case with "the balance heavily weighted in favor of the exercise of jurisdiction."  *Moses H. Cone*, 460 U.S. at 16.

### 1.  Whether the Illinois Court has Assumed Jurisdiction Over Any Res or Property

Defendants assert that this first factor favors abstention because the "Illinois state court has assumed jurisdiction over the trademarks at issue in the present case."  The Court disagrees on both legal and factual grounds.  As to the former, Defendants cite no authority that intangible property, such as  a trademark, is considered "res or property" as that term is used in the *Colorado River*

11

*Water* context.  In fact, the authority is to the contrary.  *See Wells Fargo Century, Inc. v. Hanakis*, No. 04CV1381, 2005 WL 1523788, at *10 n.3 (E.D.N.Y. June 28, 2005) ("[T]he first *Colorado River* factor looks to whether there is a particular piece of real or tangible property the rights to which are in dispute."); *Morisada Corp. v. Beidas*, 939 F. Supp. 732,  737 (D. Haw. 1995) ("Consideration of [the first *Colorado River*] factor is unhelpful here as the claims at issue do not concern tangible physical property.").

Second, even if a trademark is "res or property" under *Colorado River Water*, in this case there are no facts suggesting that the state court took control of such property.  The issue before the state court is one of contract formation and breach: whether Defendants here had a valid agreement with Beautology Brands for a 25% share in the SALON SELECTIVES marks, and whether Beautology Brands breached that agreement by unilaterally assigning the marks.   Although the amended state-court complaint requests that the Illinois court "declare a constructive trust over the assets obtained by Ontario and CLT from Beautology and/or [Salon Selectives, LLC]," (Defs.' Mot. Stay, Ex. E, Illinois Am. Compl. ¶ 37),  Defendants produce no state-court order evidencing that a trust was ever created.  Moreover, Beautology Brands assigned the SALON SELECTIVES marks to 1177216 Ontario after the initiation of the state-court action; this is directly contrary to the notion that the state court took control of the marks-at-issue.

Accordingly, this factor disfavors abstention.  *Romine*, 160 F.3d at 341 ("[W]hether the state court has assumed jurisdiction over any res or property . . . is inapposite to the instant matter because no property is at issue; this factor thus weighs against abstention").

### 2.  *Whether the Federal Forum is Less Convenient to the Parties*

This factor focuses on the geographic location of the federal and state forum, *see Romine*,

160 F.3d at 341, and, in this case, slightly favors abstention. Plaintiffs are located in Toronto, Canada. (Compl. ¶¶ 10-11.) This Detroit, Michigan, forum is closer-by-half for Plaintiffs than Dupage County, Illinois. Accordingly, this Court is presumptively the more convenient forum for Plaintiffs to litigate their claims.

On the other hand, Defendants River West and SBB have their principal offices in Illinois. (Compl. ¶¶ 12-13.) And, although not parties to this suit, Beautology Brands, its president, and Salon Selectives, LLC, are key witnesses on the issue of trademark ownership. Beautology Brands and Salon Selectives, LLC both have their principal place of business in Illinois. (Defs.' Mot. Stay, Ex. E, Illinois Am. Compl. ¶¶ 4, 5.) The geographic convenience to Almar between the two forums appears to be largely a wash: Almar is located in New York, and Jack Ashkenazie, its executive vice-president and a witness in this case, is also located there. (Illinois Am. Compl. ¶ 3.)

Because this forum is more geographically convenient for Plaintiffs, but most of the key witnesses in this and the state case are located in Illinois, this factor slightly favors abstention.

### 3. Whether Abstention Will Avoid Piecemeal Litigation

Defendants say that this factor favors abstention because at issue in the Illinois case is the dispute over the ownership of the SALON SELECTIVES marks, and, here, Defendants "will certainly raise the same issues of trademark ownership [and an] improper assignment to Plaintiffs herein." (Defs.' Mot. Stay at 9.) As stated in the parallelism analysis, there is overlap between this case and the Illinois case on a threshold issue, and, therefore, there is the potential to avoid piecemeal litigation through abstention. However, because the Illinois action does not encompass the trademark infringement claims at issue here, the Court finds that this factor only moderately favors abstention.

13

The gain in judicial economy which Defendants argue would result from abstention, is entitled to less significance than Defendants suggest.  First, the appropriate inquiry is avoiding piecemeal litigation—not simply duplication of efforts.  *See Williams v. Oak Park City School Dist.*, No. 06-CV-12512, 2007 WL 1063346, at *2 (E.D. Mich. Apr. 6, 2007) ("[T]hese cases do not involve true 'piecemeal litigation.'  The federal and state cases involve the same plaintiff, the same defendants, and the same issue . . . . Thus, this parallel litigation is duplicative, not piecemeal.  The prevention of duplicative litigation is not a factor to be considered in a state-versus-federal court abstention determination."). Rather, as *Colorado River Water* itself illustrates, the classic case of piecemeal litigation exists where the state court suit is more comprehensive than the federal suit. *See* 424 U.S. at 819 (abstaining in part because Colorado law created "[a comprehensive] system for the adjudication and management of rights to the use of the State's waters" that would reach all claims "in the totality").  Under such a scenario, the federal court would duplicate state-court efforts yet resolve only a "piece" of a larger dispute, whereas the state court would resolve the entire case. This is not the situation here—Plaintiffs have not filed a counter-claim in Illinois alleging trademark infringement; rather, that action appears to be limited to resolving ownership in Salon Selectives, LLC, and, in turn, ownership of the marks that Salon Selectives, LLC once held.

In short, by abstaining, the Court will avoid duplication of efforts on the ownership issue and potentially eliminate piecemeal litigation.  However, because the state court case does not entirely encompass this case, there is also a substantial possibility that Plaintiffs will return to this Court to adjudicate their trademark infringement claims even if this Court abstains.  Accordingly, this factor does not strongly favor abstention.

14

     *4.  The Order In Which Jurisdiction Was Obtained and The Relative Progress of the State and Federal Proceedings*

     "This factor requires the court to look into not when each complaint was filed, but rather how much progress has been made on the cases."  *Mardale Specialty Foods, LLC v. Tarantino*, No. 06-10014, 2006 WL 1328880, at *3 (E.D. Mich. 2006); *see also Inrecon, LLC v. Highland Ins. Co.*, 284 F. Supp. 2d 773, 780 (E.D. Mich. 2003) ("Considering . . . the order in which jurisdiction was obtained, it is true that the proceedings in state court [began] first.  However, the Supreme Court has counseled that the filing date is not what matters."); *Moses H. Cone*, 460 U.S. at 21 ("[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.").  That the first-to-file factor is largely subsumed in the relative progress factor is logical given that, as in *Colorado River Water* itself, the first-filed case may have made little or no progress, whereas the later-filed case may have significantly advanced.  *See* 424 U.S. at 820.  In such a situation, it makes little sense to accord weight to the mere fact that a particular action was filed first.

     Here, the Illinois case was filed on March 3, 2010—over five months before this action was filed on August 19.  However, it appears that the state-court case has not advanced significantly.  A recent copy of the state-court docket reflects that no motions for summary disposition have been filed, and, although the first amended complaint was stricken by the state-court, a second amended complaint was filed as recently as January 21, 2011.  Plaintiffs' response to Defendants' Motion to Stay in this case was filed on October 15, 2010, and there have been no updates from the parties regarding the status of the Illinois litigation since then.  Accordingly, the Court requested the state-court docket sheet.  *See Passa v. City of Columbus*, 123 F. App'x 694, 2005 WL 372305, at *3 (6th Cir. 2005) (noting that a court may "take judicial notice of a public record whose existence or

15

contents prove facts whose accuracy cannot reasonably be questioned.")  A status conference is set for March 7, 2011, and the state-court docket does not reflect a trial date.  It thus appears that the state-court is not close to resolving whether Almar and River West are entitled to an ownership interest in Salon Selectives, LLC.

Absent a strong showing that the state-court litigation is well in advance of this case, this factor slightly disfavors abstention.  *See Inrecon, LLC*, 284 F. Supp. 2d at 780 (jointly considering the priority of filing and relative progress factors, and holding that because the state case was at "essentially the same point" as the federal case, "this factor weighs against granting abstention, not for it"); *cf. Romine*, 160 F.3d at 341-42 (holding that where a state court proceeds has progressed "considerably" further than the parallel federal action, this fact "weighs strongly" in favor abstention).

### 5.  *Whether the Source of Governing Law is State or Federal*

This factor slightly disfavors abstention.  Defendants emphasize that the threshold issue of ownership of the marks will be decided under Illinois state law.  While state law clearly governs the contractual dispute, it is equally plain that Plaintiffs' claims of infringement and dilution arise under the Lanham Act.  Defendants are correct, however, that, where, as here, the state court has concurrent jurisdiction over the federal claims, "the source-of-law factor has less significance." *Moses H. Cone*, 460 U.S. at 25.  Accordingly, this factor disfavors abstention but is not entitled to significant weight.  *See id.* at 26 ("Although in some rare circumstances the presence of state-law issues may weigh in favor of . . . surrender[ing jursidiction], the presence of federal-law issues must always be a major consideration weighing against surrender."); *Gentry v. Wayne County*, No. 10-11714, 2010 WL 4822749, at *5 (E.D. Mich. Nov. 22, 2010) ("Concurrent jurisdiction may

*alleviate* concerns about surrendering jurisdiction, but the presence of federal law '*always*' militates

against abstention.").

> 6. *Whether the State Court Action Will Be Adequate to Protect the Federal Plaintiff's Rights*

"This factor involves the *state* court's adequacy to protect *federal* rights, not the federal

court's adequacy to protect state rights." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1370

(9th Cir. 1990) (citing *Moses H. Cone*, 460 U.S. at 26). Defendants are correct that the Illinois state

court has concurrent jurisdiction over Lanham Act claims. Further, there is no reason to believe that

this Court is better suited to adjudicate Plaintiffs' federal trademark infringement claims—especially

given that court's familiarity with the Illinois Uniform Deceptive Trade Practices Act, which is

similar to the Lanham Act. (*See* Defs.' Mot. Stay at 10-11.)

However, this is not the typical case where the federal claims are before both the state court

and the federal court. Plaintiffs here have not filed counter-claims of trademark infringement in the

Illinois court. When confronted with a similar situation, a court of this district reasoned that this

factor disfavors abstention:

> [C]onsider[ing] the adequacy of the state court proceeding . . .
> suggests a stay is unwise. In the usual *Colorado River* abstention
> case, the federal law claims are before both the state and federal
> courts, and it is presumed that both systems are fully equipped to
> protect a plaintiff's federal rights . . . . That consideration is
> inapplicable here, because only the federal case contains federal
> constitutional claims, and it is not the Court's role to second-guess
> how [Plaintiff] structured his lawsuits.

*Gentry*, 2010 WL 4822749, at *6; *cf. Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 31 (6th

Cir. 1984) ("While it may be true . . . that [the state court suit] *could* be modified so as to make it

identical to the current federal claim, that is not the issue here. The issue is whether [the state court

action], as it *currently* exists, is a parallel, state-court proceeding.").

The Court finds that this factor disfavors abstention.

7. *Whether the State Court Has Concurrent Jurisdiction Over the Federal Claims*

State and federal courts have concurrent jurisdiction over Lanham Act claims.  While this favors abstention, it is not entitled to significant weight.  *PaineWebber*, 276 F.3d at 208 ("The presence of concurrent jurisdiction only marginally, if at all, favors abstention"); *UEI, Inc. v. Quality Fabricated Metals, Inc.,* No. 1:06-CV-122, 2006 WL 1541353, at *6 (W.D. Mich. June 1, 2006) ("The final factor, the presence or absence of concurrent jurisdiction, is of little significance as both courts have jurisdiction.").

8. *Balancing the* Colorado River Water *Factors*

In the circumstances of this case, the primary *Colorado River Water* factors appear to be the avoidance of piecemeal litigation, the relative convenience of the state and federal forums, and the relative progress of the two cases.  Among these three key factors, the first favors abstention, the second slightly favors abstention, and the third disfavors abstention.  In balance then, the three principal factors marginally favor abstention.

The remaining factors disfavor abstention, however.  Because the abstention factors are largely in equipoise, this Court should not abstain.  *Gentry*, 2010 WL 4822749, at *6 ("[The] relative equality of factors actually makes the decision to abstain appropriate, because there cannot be *Colorado River* abstention in a close case.").  Abstention because of parallel state-court litigation is warranted only in "exceptional" circumstances and when a federal court has the "clearest of justifications." *Colorado River Water*, 424 U.S. at 817.  Further, a court must remain mindful that the balance of the factors is, "heavily weighted in favor of the exercise of jurisdiction," *Moses H.*

18

*Cone*, 460 U.S. at 16; *see also id.* at 25-26 ("[W]e emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction[;] . . . rather, the task is to ascertain whether there exist 'exceptional' circumstances . . . justify[ing] the *surrender* of that jurisdiction."). The facts of this case do not meet this high threshold for abstention. Accordingly, the Court DENIES Defendants' Motion to Stay.

## III.  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION IS DENIED WITHOUT PREJUDICE

Plaintiffs assert that they are likely to succeed in demonstrating a likelihood of confusion at trial, and that Defendants' continued use of the SALON SELECTIVES marks is causing irreparable harm to the reputation and goodwill associated with those marks. Defendants respond by claiming that they have a valid license to use the marks, and thus, Plaintiffs cannot demonstrate a likelihood of success. Defendants also assert that Plaintiffs' delay in moving for an injunction undercuts their claim of imminent, irreparable harm. For the reasons provided below, Plaintiffs' Motion for Preliminary Injunction is denied without prejudice.

### A.  Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 505 U.S. 7, 129 S.Ct. 365, 376 (2008). It should be granted "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Roghan v. Block*, 590 F. Supp. 150, 153 (W.D. Mich. 1984), *aff'd* 790 F.2d 540 (6th Cir. 1986) ("There is no power the exercise of which requires greater caution, deliberation, and sound discretion, or more dangers in a doubtful case, than the issuance of an injunction.") (citation omitted). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof

required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Thus, Plaintiffs here must affirmatively demonstrate entitlement to injunctive relief.

The preliminary injunction considerations are well known: Plaintiffs must establish (1) a strong likelihood of success on the merits; (2) that they are likely to suffer irreparable harm without an injunction; (3) that the injunction would not cause substantial harm to others; and (4) that the injunction is in the public interest. *Winter*, 129 S.Ct. at 374; *ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). Although the factors are to be balanced, a finding that there is no likelihood of irreparable harm, *Winter*, 129 S.Ct. at 375, or no likelihood of success on the merits, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), is usually fatal. It follows that a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

**B. Plaintiffs Have Not Demonstrated a Strong Likelihood of Success On The Merits**

A plaintiff's burden on this factor ranges from requiring a "strong" likelihood of success, *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977), to merely "raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation," *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). The reason for this range is that a plaintiff has a lighter burden on this factor if the others strongly favor a preliminary injunction. *In re DeLorean*, 755 F.2d at 1229 ("The varying language applied to the likelihood of success factor can best be reconciled by recognizing that the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors."); *accord Little*

*Caesar Enter., Inc. v. R-J-L Foods, Inc.*, 796 F. Supp. 1026, 1030 (E.D. Mich. 1992) ("[W]here the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation.").  As will be addressed below, the other preliminary injunction factors do not weigh in favor of awarding an injunction.  Accordingly, Plaintiffs have the burden to demonstrate a strong likelihood of success on the merits.

Plaintiffs argue they are likely to succeed in establishing that Defendants' use will result in a likelihood of confusion with, and a dilution of, their SALON SELECTIVES mark.  While demonstrating consumer confusion or "blurring" is necessary for Plaintiffs to ultimately succeed on their claims of trademark infringement, unfair competition, and dilution, it is not sufficient.  Rather, under any of Plaintiffs' theories, they have the burden to establish that they own the SALON SELECTIVES portfolio of marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-36 (5th Cir. 2010) ("There are two elements to a successful infringement claim under the Lanham Act. The plaintiff must first establish ownership in a legally protectible mark, and second show infringement  by demonstrating a likelihood of confusion." (internal alterations, quotation marks, and citations omitted)); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 821 (3d Cir. 2006) ("Much of the permanent injunction is premised on the District Court's conclusion that defendants . . . engaged in federal unfair competition . . . in violation of 15 U.S.C. § 1125(a), federal dilution in violation of 15 U.S.C. § 1125(c), and common law unfair competition. The threshold premise underlying this outcome is the District Court's conclusion that plaintiff owns the . . . mark").  In addition, Defendants raise the affirmative defense of holding a valid license to use the marks.  The Court analyzes the license defense first, and then turns to the ownership inquiry.

*1. There is Insufficient Argument and Evidence to Support Defendants' License Defense*

Defendants argue somewhat inconsistently regarding the genesis of Almar's purported oral license.  On the one hand, Defendants assert that "Almar was granted a license to use the SALON SELECTIVES trademarks by Dr. Zeffren, in his capacity as CEO of SBB *at the time that SBB owned the marks*."  (Defs.' Resp. to Pls.' Mot. Prelim. Inj. at 5 (emphasis added).)  Elsewhere, however, Defendants assert that if SBB did not own the marks, it granted Almar a sub-license based on River West's license from Unilever.  (Defs.' Summ. J. Reply at 1 n.1.)  Both theories fail.

Defendants have not shown that SBB owned the marks at the time Zeffren allegedly granted a license to Almar.  (*See* Pls.' Prelim. Inj. Reply at 1.)  Defendants assert that in December 2006, River West entered into an agreement with Unilever "under which Unilever would exclusively license the SALON SELECTIVES portfolio of marks in exchange for certain guaranteed annual minimum royalties."  (Ashkenazie Decl. ¶ 10.)  Defendants further explain that toward the end of 2007, "SBB (through River West and with the assistance of Almar) wished to pay off the remaining royalties due to Unilever and wished to obtain an outright assignment of the SALON SELECTIVES portfolio of marks.  *This was accomplished in February 2008* . . . ."  (Ashkenazie Decl. ¶¶ 15-16 (emphasis added).)  Yet, Defendants assert that Zeffren (on behalf of SBB) granted Almar a license in "late 2007," and that Zeffren reported this grant to the SBB board of directors "in November 2007."  (Ashkenazie Decl. ¶¶ 20-24.)  Thus, based on Defendants' own evidence, SBB did not yet own the marks, when SBB purportedly licensed Almar to use the marks, .

Apparently recognizing this problem, Defendants—in a single footnote in their briefing—assert that even if SBB did not own the marks, Almar still has a viable defense to infringement because SBB granted it a sub-license derived from the Unilever-River West license.  (Defs.'

Summ. J. Reply at 1 n.1.)  This argument is not well developed, and moreover, appears to be fatally flawed.

Unless a licensor explicitly grants its licensee the right to sub-license the licensed mark, any putative sub-license is invalid as a matter of law.  *Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F. Supp. 212 (S.D.N.Y. 1996); *see also Miller v. Glenn Miller Prods.*, 454 F.3d 975, 992 (9th Cir. 2006) ("[A] trademark licensee such as [defendant] may not sub-license without express permission from the original licensor . . . .").  "The reason [for this rule] is that because the trademark owner has a duty to control the quality of goods and services sold under the mark, it must have the right to pass on the abilities of new potential licensees."  3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (*McCarthy*) § 18.43 (4th ed. 2010); *see also Miller*, 454 F.3d at 992 ("Common sense suggests that if a trademark licensee could unilaterally sub-license a mark without notifying or obtaining consent from the licensor, then a trademark licensor would lose his ability to police his mark . . . .").

In *Tap Publications*, when presented with analogous facts, the court found that the sub-license rule barred the plaintiff's trademark infringement claim.  There, the owner of the mark-at-issue, Asia Systems Media ("ASM"), entered into a settlement agreement with non-party Key Publications ("Key"), which granted Key the right to use ASM's trademark on its telephone directory.  The plaintiff, Tap Publications ("Tap"), sued ASM claiming that it was the successor-in-interest to Key and, therefore, had the exclusive right to use the mark.  The court disagreed.  In particular, it applied the sub-license rule and held that nothing in the settlement agreement between ASM and Key granted Key the right to assign its rights in the mark, and, accordingly, "the rights conferred upon Key to use the mark in dispute were personal to Key, and . . . were not assignable

23

or otherwise transferable." *Id.* at 218. The court held that Tap, which asserted an interest in ASM's mark based on an assignment from Key, had "no rights to the mark." *Id.* (Although the sub-license holding was in the alternative, it was not dicta. *See Tap Publications*, 925 F. Supp. at 218 ("Tap's argument fails for *two independent reasons*. First, the [Key-ASM] settlement agreement did not give Tap [*sic*] the power to assign or transfer its rights in the mark. Second, the [subsequent] agreement between Tap and Key did not include any rights in the mark that Key may have had.")).

Under Defendants' sub-license theory, River West allegedly obtained an exclusive license from Unilever in December 2006, and in late 2007, SBB granted Almar a sub-license. There is a missing link, however. Defendants do not explain how, by late 2007, SBB had acquired its interest in the marks. The fact that River West owned a 50% interest in SBB does not warrant an inference that SBB also had a license from Unilever (or River West). A company may invest in another without giving its investment its assets. Thus, it appears that under Defendants' theory, not one, but two sub-licenses must exist: first, River West sub-licensed SBB to use the marks, then, in late 2007, SBB sub-sub-licensed Almar to use the marks.

Both steps are problematic for Defendants. First, there is no evidence suggesting that Unilever ever granted River West the authority to grant a sub-license to SBB. Indeed, it appears that SBB did not even exist in December 2006 when Unilever granted River West a license. (*See* Illinois Am. Compl. ¶¶ 9-10.) Nor is there evidence that River West gave SBB the right to sub-sub-license to Almar. Although Mark Thumann, CEO of River West, stated that he "did not have any objection to [Zeffren's] grant of the license" to Almar (Defs.' Resp. to Pls.' Mot. Prelim. Inj., Ex. B, Thumann Decl. ¶ 5), Thumann was not acting on behalf of River West in that capacity. Rather, he was acting as a member of SBB's Board of Directors. (*Id.*) Because Defendants produced insufficient evidence

24

as to both the Unilever-River West license and the River West-SBB sub-license, the Court concludes that neither included express permission to sub-license. *See Miller v. Glenn Miller Prods.*, 454 F.3d 975, 992 (9th Cir. 2006) ("[B]ecause it is undisputed that the two agreements do not expressly authorize [defendant] to sub-license, as a matter of law, [defendant] lacks the unilateral authority to sub-license its right[s]."); 3 *McCarthy* § 18.43 ("The right of a licensee to sub-license others must be determined by whether the license clearly grants such a power. . . . Without specific authorization from the trademark owner, the licensee's right to use the licensed mark is personal and cannot be sold or assigned to another.").

Defendants' sub-license theory is problematic for another reason. Under Defendants' theory, SBB was a sub-licensee of the original Unilever-River West license. Then, in February 2008, River West paid off the remaining royalties owed to Unilever under the Unilever-River West license, and, the marks were assigned to SBB. (*See* Ashkenazie Decl. ¶¶ 15-16.) For the original royalty license to have survived, the Court must assume that, upon the assignment, SBB stepped into Unilever's shoes and thereby became the licensor. But this creates a circular relationship, because, as just stated, SBB was a (sub-)licensee of that very license. To the extent that SBB's sub-license was extinguished when it became the licensor, Defendants do not explain how Almar's license, itself derived from SBB's sub-license, survived. *Cf. Donk v. Alexander*, 117 Ill. 330, 338 (Ill. 1886) (finding where company was assigned judgment and thus became creditor, but previously had acquired the judgment-debt, that "when the qualities of debtor and creditor become united in the same individual, there arises a confusion of rights which extinguishes both qualities"); *Matter of Estate of Ozier*, 587 N.E.2d 77, 80 (Ill. Ct. App. 1992) ("The doctrine of merger provides that when the same person who is bound to pay is also entitled to receive, there is an extinguishment of rights,

25

such that the debtor and creditor become the same person and there can be no right to put in execution."); *Ellis v. McClung*, 683 N.E.2d 911, 918  (Ill. Ct. App. 1997) ("A merger occurs when the dominant (benefited) estate and the servient (burdened) estates are owned by the same person, thereby extinguishing an easement by virtue of unity of title and possession, given that one has no need of an easement over one's own property.").

Finally, Defendants suggest that Almar's sub-license is a *five-year*, *irrevocable* license. Defendants never explicitly declare that the Almar license is irrevocable, but if not, nothing would prevent Plaintiffs from now revoking the alleged license.  Indeed, Plaintiffs have argued that Salon Selectives, LLC revoked the alleged license by sending Defendants the May 2010 cease-and-desist letter. (Pls.' Resp. to Defs.' Mot. Dismiss at 6.)

Defendants also strenuously argue that, as a matter of basic property law, one cannot assign an interest greater than it owns.  (Defs.' Mot. Dismiss Reply at 1-2.)  Yet, Defendants neither assert nor produce any evidence suggesting that in late-2007 (when the SBB-Almar license was allegedly created,) that SBB itself had an interest equivalent-to or greater-than a five-year, irrevocable license. The same holds for River West under the Unilever-River West license.  Indeed, given that  River West was able to pay-off the remaining royalties on its license with Unilever (so that SBB could obtain an outright assignment of the marks) it does not appear that the Unilever-River West license was one for a fixed, multi-year term.

In sum, Defendants' license defense is not viable at this juncture of the litigation.  In particular, Defendants have not produced the Unilever-River West license evidencing that (1) River West had the right to grant sub-licenses, and (2) the scope of that original license is equal-to or greater-than the scope of the license allegedly granted to Almar in late-2007.  Similarly, Defendants

26

have not demonstrated how and when SBB acquired its license, and the scope of that license. Further, Defendants do not explain how, as a matter of property law, Almar's sub-license survived the merger of all interests in the SALON SELECTIVES marks in SBB.  Given the forgoing, Defendants' license claim has no adverse impact on Plaintiffs' claim of a likelihood of success on the merits.  Although River West did not file a separate brief opposing Plaintiffs' Motion for Preliminary Injunction, the Court notes that the license theory does not appear to be viable as to River West, either.  First, the Unilever-River West license appears to have terminated once the royalties due to Unilever were paid-off.  Second, there is no allegation that SBB ever granted River West a license—let alone a multi-year, irrevocable license.

### 2.  Plaintiffs Have Not Carried Their Preliminary Injunction Burden on the Issue of Ownership

Plaintiffs do not address ownership in their preliminary injunction motion.  Defendants do not do much better; while providing some basic facts regarding ownership as relevant to the abstention inquiry, Defendants do not argue the issue on the merits.

Although neither party adequately addresses ownership, it remains Plaintiffs' burden to demonstrate a strong likelihood of success on this issue.  *See Everett Labs., Inc. v. Vertical Pharm. Inc.*, 227 F. App'x 124 (3d Cir. 2007) (reviewing district court's denial of preliminary injunction and noting that plaintiff "had the burden before the District Court of showing . . . that [it] own[ed] the mark").  Accordingly, the Court evaluates whether Plaintiffs' *evidence* of ownership is plain enough on its face to carry Plaintiffs' preliminary injunction burden.  The Court finds that it is not.

Plaintiffs produce evidence suggesting that the SALON SELECTIVES marks, first registered in the mid-1980s may have obtained incontestable status well before the events leading to this litigation.  (Compl. Ex. A (Trademark Electronic Search System documents evidencing both a

27

registration of SALON SELECTIVES marks in the mid-1980s and the filing of Section 15 affidavits pertaining to incontestability).)  A registered mark obtains incontestable status if (1) there has been no final decision adverse to the trademark registrant's claim of ownership over the mark; (2) there is no pending adjudication involving ownership rights; (3) the registrant has filed a "Section 15" affidavit asserting that (a) the mark has been continuously used in commerce for five years post-registration, (b) is still in use, and (c) conditions (1) and (2) are met; and (4) the mark has not become a generic. *See* 15 U.S.C. § 1065(1)-(4).

An "incontestable" trademark provides "conclusive evidence . . . of the registrant's ownership of the mark," subject to statutorily-enumerated defenses. 15 U.S.C. § 1115(b).  Further, as relevant to 1177216 Ontario's acquisition of the marks, the Lanham Act provides that the term "registrant" includes the original registrant's "successors and assigns" of the mark. 15 U.S.C. § 1127.

Although it is possible to interpret the incontestability provisions of the Lanham Act to have established ownership in favor of Plaintiffs, this would be an incorrect understanding of those provisions. *See Federal Treasury Enterprise Sojuzplodoimport v. Spirits Intern. N.V.*, 623 F.3d 61 (2d Cir. 2010).  In *Federal Treasury Enterprise*, the plaintiff sued claiming infringement of its famous STOLICHNAYA vodka trademarks.  *Id.* at 62-63.  The district dismissed the plaintiff's trademark infringement claims because it concluded (1) that the mark had become incontestable when held by one of the defendant's predecessors-in-interest, and (2), that, as set forth in 15 U.S.C. § 1127, the term "registrant" embraced the defendant—an assignee.  *Id.* at 67.

The Second Circuit Court of Appeals disagreed.  It reasoned that the district court's application of the Lanham Act's incontestability provisions would lead to "perverse" results:

> The district court was . . . called upon to inquire whether a valid assignment had ever actually taken place. This inquiry was required because only after a valid assignment of trademarks does the assignee succeed to the rights of the assignor. . . .
>
> If the mere fact that the registrant satisfied the requirements for incontestability could preclude [plaintiff's] claim, then incontestability would transform recording—a ministerial act—into a mechanism for conclusively defeating allegations . . . challenging the legality of the assignment. [This] statutory interpretation would lead to a perverse result in cases such as this, where all parties agree that the trademarks became incontestable in 1974, but the disputed assignment comes from a series of transactions that occurred many years later.

*Id.* at 67-68.   Accordingly, the appellate court held that "the question of the validity of the assignment is antecedent to the question of incontestability."  *Id.* at 69.

The reasoning of *Federal Treasury Enterprise* is persuasive and its holding applies here.  In particular, assuming, without deciding, that the SALON SELECTIVES marks are incontestable, the Court must still decide the antecedent question:  whether the assignment from Salon Selectives, LLC to Plaintiff 1177216 Ontario was valid.  Only if that assignment is deemed valid, would Plaintiffs be entitled to the statutorily mandated "conclusive evidence" of ownership.  Thus, the fact that the SALON SELECTIVES marks may be incontestable, does not aid Plaintiffs in establishing that 1177216 Ontario is the owner of those marks.

In evaluating the evidence surrounding the alleged agreement between Almar, River West, A.P. Deauville, and Beautology Brands, and the subsequent assignment from Salon Selectives, LLC to Plaintiffs, it is undisputed that only Beautology Brands purchased the marks from Hilco, and that Beautology Brands placed the acquired assets into Salon Selectives, LLC.  (Ashkenazie Decl. ¶ 37.) Further, Plaintiffs produce a "Confirmatory Assignment," executed by Stuart Strauss, the President of Beautology Brands and also, apparently, of Salon Selectives, LLC, which assigns the marks from

Salon Selectives, LLC to Ontario 1177216.  (Dkt. 12, Pls.' Prelim. Inj. Reply, Ex. A.)  This evidence favors a finding that Plaintiffs are likely to succeed on the ownership issue at trial.

On the other hand, although the record is sparse, Defendants appear to have a plausible claim to ownership of the marks.  First, Defendants produce a declaration from Jack Ashkenazie, Almar's Executive Vice President, which states that an oral agreement between the four companies had been reached, and that under the agreement, Defendants would each own a 25% share of Salon Selectives, LLC.  (Ashkenazie Decl. ¶¶ 34-36, 38.)  These statements are unrebutted by Plaintiffs.  Second, although many critical details surrounding the agreement are absent, there is at least some support for the contention that the four companies reached an oral agreement after Beautology Brands acquired the marks and transferred the assets to Salon Selectives, LLC.  In particular, on the day of Beautology Brands' purchase of the marks from Hilco, an email from Strauss stated that he was willing to split the ownership of Salon Selectives, LLC four ways if certain conditions were met:

> It was a pleasure talking with you all[1] on the phone today.  Although I feel that I have acted in good faith throughout this process and could proceed as planned, after additional consideration and in the spirit of fairness and partnership I will agree to the 25% split 4 ways. The only thing I ask in return is that Almar and AP Deauville each pay to Beautology $75,000 in consideration of me making this concession. . . .  This amount will be paid when the 25% ownership interests in Salon Selectives LLC are transferred.  If you are not able to agree to these terms, I will be forced to proceed on my own . . . . I imagine that we can take care of all of this and the many details we need to clarify very soon after closing and then put this all behind us and get to work on building the brand.

(Illinois Am. Comp., Ex. B1.)  Further, it appears, based on an allegation in the Illinois complaint, that there was a second email in which Strauss stated, "I just want to let you know that the

---

[1]Strauss' email was sent to Mark Thumann, CEO of River West, Jack Ashkenazie of Almar, and an "fhorowitz" at A.P. Deauville.

agreement between Beautology Brands Company and the bank has been completed.  I look forward to completing our agreement and building the brand to even greater heights than before." (Illinois Am. Compl. ¶ 24.)   The foregoing suggests that Defendants may each be entitled to a 25% share in Salon Selectives, LLC.

If Defendants can establish that they were members of Salon Selectives, LLC, the validity of the assignment to Plaintiffs is in doubt.  Under Illinois law, it appears that unless a limited liability company agrees otherwise, the sale or transfer of "substantially all" of a limited liability company's assets requires approval from every LLC member. *See* 805 ILCS 180/15-1(b)(2), (c)(11) (providing that in a manager-managed LLC, "any matter relating to the business of the company may be exclusively decided by the [limited liability company's] manager," but that "the sale, lease, exchange, or other disposal of all, or substantially all, of the company's property with or without goodwill" requires "consent of all of the members").  Given that Salon Selectives, LLC, was merely a holding company for the SALON SELECTIVES portfolio of marks (and possibly the corresponding inventory), the reasonable inference is that the marks were "all, or substantially all" of its assets.  Further, under Defendants' theory, Almar and River West would be considered members of the LLC prior to Salon Selectives, LLC's transfer to Plaintiffs.  Accordingly, if Defendants can establish ownership in Salon Selectives, LLC, the assignment to Ontario 1177216 may be invalid.

In sum, while the record and legal arguments are far from sufficient to conclude that Defendants have an ownership interest in the marks, it is enough to say that Defendants' position is not implausible, and creates considerable doubt as to whether Ontario 1177216 owns the marks.  Given that Plaintiffs provide no argument to the contrary, the Court cannot say that Plaintiffs carried

their burden to establish a "strong" likelihood of success on the ownership of the marks.  *See Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) ("It is because preliminary injunctive relief is such a 'drastic' remedy that [Plaintiffs] must show circumstances [that] clearly demand its entry." (citations omitted)).  Accordingly, this factor does not favor entry of a preliminary injunction.

### C. Plaintiffs Have Not Demonstrated That They Are Likely To Suffer Irreparable Harm

Plaintiffs have the burden to show that "without [an] injunction [they] 'will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated.'"  *Cox v. Correctional Medical Servs., Inc.*, No. 06-10350, 2006 WL 3147733, at *4 (E.D. Mich. Oct. 25, 2006) (quoting *Abney v. Amgem, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006)).  Although Defendants' argument on this factor is unpersuasive, the Court nevertheless finds that Plaintiffs have not satisfied their burden.

Defendants assert that Plaintiffs' delay in moving for a preliminary injunction precludes a finding of irreparable harm.  Defendants are correct that "'[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.'"  *Blockbuster v. Laylco, Inc.*, 869 F. Supp. 505, 516 (E.D. Mich. 1994) ((quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275-76 (2d Cir. 1985))).  However, Plaintiffs' delay is too brief to significantly alter the irreparable harm inquiry.

The Confirmatory Assignment, assigning Salon Selectives, LLC's interest in the SALON SELECTIVES marks to Ontario 1177216, was not executed until June 28, 2010.  Plaintiffs moved for a preliminary injunction on August 19, 2010.  Thus, Plaintiffs delay, measured from the time they first had standing to sue to when they moved for an injunction, was less than two months.

32

Defendants rely on cases suggesting that a two-month delay in seeking an injunction in a trademark infringement case can justify a finding of no irreparable harm. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (citing Southern District of New York cases for the proposition that "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months"); *Weight Watchers Intern., Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks [in a trademark infringement case] sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."). However, a broader review of the cases reveals that a two-month delay is on the extreme end of the spectrum, and, moreover, it appears that only courts in the Second Circuit hold plaintiffs to such a demanding standard. Sandra Edelman, *Delay in Filing Preliminary Injunction Motions*, 99 Trademark Rep. 1074, 1076 (2009) (surveying the effect of a plaintiff's delay on the irreparable harm inquiry in trademark cases and concluding that "[o]utside of the Second Circuit, the cases decided since 2002 indicate that plaintiffs who delay three months or less in seeking preliminary injunctive relief can . . . be confident they can show irreparable harm. . . ."). In the Sixth Circuit, it does not appear that trademark holders are held to such a high standard. *Compare R.L. Polk & Co. v. Infousa, Inc.*, 230 F. Supp. 2d 780, 795-96 (E.D. Mich. 2002) (finding three-month delay did not weigh against a finding of irreparable harm) *with Wells Fargo v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 771 (E.D. Mich. 2003) (finding nine-month delay "undermines [plaintiffs'] allegation of irreparable harm"). Accordingly, while the Court acknowledges that Plaintiffs two-month delay in moving for an injunction raises some doubt as to whether they urgently need injunctive relief, that doubt is not significant.

For their part, Plaintiffs assert that a court may presume irreparable harm once a likelihood

of success has been shown on consumer confusion.  (Pls.' Mot. Prelim. Inj. at 12-13.)  There is some controversy as to whether the presumption of irreparable harm in trademark cases survived *eBay, Inc. v. MercExchange*, 547 U.S. 388 (2006).  There, the Supreme Court held that irreparable harm does not necessarily follow from a finding of patent infringement.  Rather, when considering the remedy of a permanent injunction, a court must consider the four well-established equitable factors: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.* at 391.

The Sixth Circuit has yet to address whether *eBay* applies to injunctions in trademark cases.  The Second Circuit, however, recently held that *eBay* applies to a preliminary injunction for copyright infringement; it also noted, "although today we are not called upon to extend *eBay* beyond the context of copyright cases, we see no reason that *eBay* would not apply with equal force to an injunction in any type of case."  *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010).

Nonetheless, it would be inappropriate to apply such a presumption in this case.  In particular, given the questions surrounding ownership, and, consequently, Plaintiffs' failure to establish a likelihood of success, the asserted presumption is inapplicable.  *Trenton Corp. v. Superior Corrosion Control, Inc.*, No. 06-15699, 2007 WL 268792, at *5 (E.D. Mich. Jan. 25, 2007) (holding, in a trademark infringement case, that "because [plaintiff] has not shown a strong likelihood of success on the merits, it is not entitled to the presumption of irreparable harm."); *Jimdi, Inc. v. Twin Bay Docks and Prods., Inc.*, 501 F. Supp. 2d 993, 1010 (W.D. Mich. 2007) ("Because the Court has concluded that [plaintiff] has not shown that it is likely to succeed on its claims, [its]

34

reliance upon *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595 (6th Cir. 1991), for the proposition that injunctive relief should normally follow upon a finding of likelihood of confusion, is misplaced.").

The evidence is insufficient to support a conclusion that Plaintiffs' established irreparable harm. Plaintiffs proffer no evidence of tangible harm such as lost sales or profits. Nor do they have any evidence of actual consumer confusion. Further, Plaintiffs have not produced any evidence that they intend to use the SALON SELECTIVES mark in a different manner than Defendants. Plaintiffs have not, for example, indicated that they intend to sell hairbrushes of a higher quality or a different style, or that they intend to discontinue marketing hairbrushes altogether. While Plaintiffs may ultimately have the right to control the application of the SALON SELECTIVES mark, the fact that there is no evidence of a present intent to do anything other than what Defendants are doing, suggests that maintaining the status quo until trial will not result in irreparable damage to the goodwill or reputation associated with the mark. Given the lack of evidence, irreparable harm remains speculative and does not appear imminent. Thus, the Court finds that this factor disfavors injunctive relief.

### D. The Balance of the Hardships Slightly Favors Defendants

Although the foregoing two factors are dispositive of Plaintiffs' motion, this factor also disfavors—albeit slightly—awarding an injunction. "In considering this factor, the Court must (1) balance the harm Plaintiff would suffer if its request for a preliminary injunction were denied against the harm Defendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Georgia-Pacific Consumer Prods. LP*, No. 1:09-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug.

3, 2009); *accord Trenton Corp. v. Superior Corrosion Control, Inc.*, No. 06-15699, 2007 WL 268792, at *6 (E.D. Mich. Jan. 25, 2007).

Plaintiffs ask this Court to enjoin Defendants from selling hair hairbrushes and combs bearing the SALON SELECTIVES mark. This would be a significant change to the status quo given that, as Plaintiffs themselves assert, Defendants' products are sold in "retail locations throughout the U.S." (Pls.' Mot. Prelim. Inj. at 2.) The removal of Defendants' products from store shelves would be costly to Defendants, as would the storage or destruction of the allegedly infringing products. Further, Defendants' business associates—retail stores or manufacturers—would presumably be notified that the reason for the court-ordered removal was because Defendants' products are likely infringing the SALON SELECTIVES marks. This may adversely impact Defendants' relations with those entities.

It is also noteworthy that the harm from denying an injunction is tempered by the fact that Plaintiffs purchased the marks while there was a cloud upon their title. In particular, Plaintiffs knew, actually or constructively, that there was ongoing state-court litigation regarding the ownership of Salon Selectives, LLC, when it received an assignment from that very company in June 2010. Further, by the time Plaintiffs acquired the marks, the seven-day deadline set forth in Salon Selectives, LLC's cease-and-desist letter had lapsed. Accordingly, prior to acquisition of the marks, Plaintiffs were fully aware that Defendants (1) believed they had the right to use the SALON SELECTIVES marks on hairbrushes and combs, and (2) would continue to use that mark upon those goods. In this way, Plaintiffs can be seen to have assumed some risk that they would not be awarded a preliminary injunction when they acquired the marks. This fact mitigates some of the harshness of denying an injunction.

36

On the other hand, Defendants also assumed certain risks.  In 2008, SBB's assets were sold to Hilco because of SBB's financial troubles.  At this point, Almar and River West must have considered the possibility that reacquisition of the SALON SELECTIVES marks may never occur. Yet, Defendants continued to sell hairbrushes and combs bearing those marks. *See Midwest Guar. Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003) (holding, where defendant chose to enter Michigan market with a possibly confusingly similar mark, that defendant "cannot place itself in harms way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct").

Given the foregoing, in particular, the significant change in the status quo if an injunction issues, and the risks Plaintiffs assumed when acquiring the marks, the balance of hardships tips slightly in favor of denying injunctive relief.

### E. Conclusion as to Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs have not made the requisite showing of imminent, irreparable harm.  This alone suffices to deny their Motion for Preliminary Injunction. *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 970 (W.D. Mich. 2008) ("The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors."); *see also Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("[T]he demonstration of some irreparable injury is a *sine qua non* ("Indispensable, absolutely necessary or essential." OXFORD ENGLISH DICTIONARY (2d ed. 1989)) for issuance of an injunction.").  In addition, given the doubts raised by Defendants regarding Ontario 1177216's ownership of the marks, and no attempt by Plaintiffs to quell those doubts, a strong likelihood of success on the merits has not been demonstrated.  This, too, is arguably dispositive of Plaintiffs' motion. *Gonzales*, 225 F.3d at 625

("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

This denial of Plaintiffs' Motion for Preliminary Injunction is, however, without prejudice. To the extent they require discovery on that issue, they should file a motion for expedited discovery. Further, if either party believes that Beautology Brands and/or Salon Selectives, LLC is a necessary party, they should file the appropriate motion.

## IV. DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Defendant Almar moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Complaint on the grounds that "Almar at all relevant times had and continues to have a valid license to sell grooming accessories under the marks-in-suit." (Dkt. 10, Defs.' Mot. Dismiss at 2, ¶ 2.) Defendants River West and SBB rely on Almar's Motion to the extent it applies to them. (Dkt. 14.) Because Defendants' arguments in their Motion to Dismiss are identical to the arguments asserted in their Response to Plaintiffs' Motion for Preliminary Injunction, their Motion is DENIED. (*See* Defs.' Mot. Dismiss at 1 ("Plaintiffs have also moved the Court for a preliminary injunction, and Almar is submitting a separate brief opposing that motion *on the same basis* [as this Motion to Dismiss]." (emphasis added)).)

### A. Legal Standards

#### 1. *Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)*

A complaint may be dismissed for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding whether a plaintiff has stated a cognizable claim, a court accepts as true all well-pleaded factual allegations, and reads the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

38

to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009).

### 2.  *Summary Judgment Pursuant to Fed. R. Civ. P. 56(a)*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party has the initial burden demonstrate an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, the burden shifts to the party opposing the motion to cite to "particular parts of materials in the record" demonstrating that a fact "is genuinely disputed."  *See* Fed. R. Civ. P. 56(c). Viewing the evidence in the light most favorable to the non-moving party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989).

### B.  The Court Denies Defendants' Motion to Dismiss or for Summary Judgment

Plaintiffs' Complaint asserts that "Defendants offer for sale and sell hair care products, including brushes and combs, bearing the trademark SALON SELECTIVES, which is identical to the incontestable federally registered trademark of Plaintiffs for Plaintiff's [*sic*] internationally famous hair care products." (Compl. ¶ 2.)  Accompanying this allegation is a picture of a hairbrush, which Plaintiffs apparently include as an example of one infringing product produced or sold by Defendants.  (*Id.*)  The label on the hairbrush states:

> © 2008 Salon Selectives
> Salon Selectives is a registered trademark of Selective Beauty Brands
> LLC licensed for use by Almar Sales Co., Inc.

(*Id.*)  Defendants argue that because this image includes a statement that SBB licensed the SALON SELECTIVES marks to Almar, Plaintiffs were required to plead the absence or invalidity of the referenced license.  Because Plaintiffs have not so pled, Defendants conclude that dismissal under Rule 12(b)(6) is justified.  The Court disagrees.

Defendants are correct that if their use of the SALON SELECTIVES marks is within the scope of a valid, enforceable license, they have an affirmative defense to a claim of trademark infringement.  *Burkitt v. Flawless Records, Inc.*, No. 03-2483, 2005 WL 6225822, at *12 (E.D. La. June 13, 2005) ("It is clearly established that a licensee has an affirmative defense to a claim of trademark infringement."); *cf. Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) ("The existence of a license creates an affirmative defense to a claim of copyright infringement.").  However, at least as a general matter, a plaintiff is not required to plead the absence or invalidity of a license—rather it is a defendant's burden to assert a license as an affirmative defense.  *See* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . [a] license.").

Defendants suggest that Plaintiffs shifted the normal burden, by including the image in their allegations.  To so conclude, however, requires the Court to draw inferences in favor of Defendants and against Plaintiffs—exactly the opposite of what a Court is to do on a Rule 12(b)(6) motion.  In particular, Defendants assert that by including the hairbrush image, "the Complaint acknowledges Almar's claim of a license."  (Defs.' Mot. Dismiss at 5.)  Drawing all reasonable inferences in favor of Plaintiffs, however, the purpose for including the image was merely to demonstrate that Defendants currently sell products bearing the SALON SELECTIVES marks.  Thus, reading the Complaint in the light most favorable to Plaintiffs, their "statement" was neither a concession nor

40

"acknowledg[ment]" of the validity or existence of a license.

Even assuming that Defendants are correct about Plaintiffs' pleading burden, the Court would not dismiss Plaintiffs' Complaint but instead would grant them leave to amend. As discussed in connection with Plaintiffs' Motion for Preliminary Injunction, there are evidentiary and analytical gaps regarding Defendants' license theory. In particular, (1) Defendants apparently did not own the marks when SBB allegedly granted Almar an oral license, (2) River West may not have had authority to grant a sub-license to SBB under the Unilever-River West license (which has not been produced), (3) any sub-license granted to SBB may not have survived the merger of interests when SBB was assigned the marks outright, and (4) River West, SBB or both, may not have an interest equivalent or greater than that granted to Almar under the purported license (a five-year, irrevocable license). Thus, granting Plaintiffs leave to plead the non-existence or invalidity of a SBB-Almar license would not be futile.

Because of these unaddressed issues, the Court denies Defendants' Motion for Summary Judgment. Summary judgment is also premature at this stage of the litigation. Defendants filed their motion less than a month after Plaintiffs filed their Complaint. Defendants' license defense relies on facts not readily available to Plaintiffs, for example, a copy of the Unilever-River West license. Further, Plaintiffs should have an opportunity to depose or serve interrogatories upon Ashkenazie, whose declaration is Defendants' primary evidence supporting their oral license theory. Moreover, given the parties' doubt as to whether this Court would abstain, Plaintiffs may have not believed it prudent to advance in discovery. *See Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (noting that in contrast to a motion to dismiss, "a motion for summary judgment may not be granted until a plaintiff has had an opportunity for

discovery."); *Wells v. Corporate Accounts Receivable*, 683 F. Supp. 2d 600, 602 (W.D. Mich. 2010) (noting that "a motion for summary judgment filed before the close of discovery is often denied as premature in this circuit, either on the opposing party's Rule 56(f) affidavit and request or on the court's own initiative without an explicit request from the opposing party."); Jeffrey W. Stempel & Steven S. Gensler, 11 *Moore's Federal Practice* § 56.60 (3d ed. 2010) ("The better course for a court faced with a pre-discovery summary judgment motion will often be to deny the motion without prejudice or to defer consideration until some discovery has occurred.").

**V. CONCLUSION**

The Court:

(1)     DENIES Defendants' Motion to Stay;

(2)     DENIES Plaintiffs' Motion for Preliminary Injunction WITHOUT PREJUDICE; and

(3)     DENIES Defendants' Motion to Dismiss and DENIES Defendants' Motion for Summary Judgment WITHOUT PREJUDICE.

 /s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 4, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 4, 2011.

s/Linda Vertriest
Deputy Clerk